# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

SOWATEI LOMOTEY                          :
         Plaintiff,             :
v.                                       :
                                        :
STATE OF CONNECTICUT                     :     Civil No. 3:05cv1711 (PCD)
DEPT. OF TRANSPORTATION                  :
and ROBERT ZAFFETTI                      :
         Defendants.            :

-----------

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Sowatei Lomotey brings this action alleging discrimination on the basis of race, color, and national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq., and Conn. Gen. Stat. § 46a-60, including allegations of failure to promote, retaliation, and creation of a hostile work environment. Plaintiff also brings claims under Conn. Gen. Stat. § 46a-58 and 42 U.S.C. § 1983. Defendants State of Connecticut Department of Transportation and Robert Zaffetti, sued in his official capacity (Compl. ¶ 90), move pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment as to all claims. For the reasons stated herein, Defendants' motion for summary judgment as to all claims [Doc. No. 76] is **granted.**

## I.      Background

Plaintiff is a black person from the African country of Ghana. (Compl. ¶ 3) He earned a bachelor of science degree in civil engineering from the State University of New York ("SUNY") at Buffalo in 1974, and a masters degree in structural engineering from SUNY Buffalo in 1978. Plaintiff also has Professional Engineer licenses from the states of Massachusetts and Connecticut in Civil and Structural Engineering. Following graduation, he worked for various

engineering firms and the Massachusetts Department of Transportation.  He was then employed at two engineering consulting firms, Greiner & Close and Jensen & Miller, P.C., for a combined ten (10) years immediately prior to being hired by Defendant Connecticut Department of Transportation ("DOT") in 1994.  Plaintiff was hired in early 1994 as an Engineer Intern in the Major Bridge Group of the Structures Section of the Consultant Design Division in the Bureau of Engineering and Highway Operations.  Within nine (9) months of being hired as an Engineer Intern, and after scoring highly on the applicable exam within the Decentralized Promotional Examination Program, Plaintiff was promoted to Transportation Engineer 3 ("TE3"), bypassing the job levels of Transportation Engineer 1 & 2.

The typical career progression within DOT is Engineer Intern ("EI"), Transportation Engineer 1 ("TE1"), Transportation Engineer 2 ("TE2"), Transportation Engineer 3 ("TE3"), Transportation Supervising Engineer ("TSE"), and Transportation Principal Engineer ("TPE").[1] Defendants represent that the next steps are Transportation Assistant District Engineer ("TADE") and Transportation District Manager ("TDE"), which usually progress from the TPE position, although the job descriptions allow for eligibility based on TSE experience.[2]

Plaintiff was under the direct supervision of Defendant Robert Zaffetti, a Transportation Supervising Engineer ("TSE"), from 1994 through June 1999, when Plaintiff was placed under

---

[1] Plaintiff concedes that this is the typical career progression but argues that he was clearly not on the typical path given his promotion from EI to TE3.  (Pl.'s 56(a)(2) Statement at ¶ 8.)  (See also Pl.'s Opp. to Mot. for Summ. Judgment at 16.)  While Plaintiff has, in his Rule 56(a)(2) statement, admitted or denied Defendants' statements of undisputed facts, Plaintiff has failed to include a separate itemization of each disputed issue of material fact, as required by the local rule.  D. Conn. L. Civ. R. 56.

[2] Plaintiff denies that there is a path of progression from the TPE position, arguing that Defendant fills these positions discretionarily.  (Pl.'s 56(a)(2) Statement at ¶ 9.)

2

the supervision of Gary Abramowicz, another TSE in the Major Bridge Group.  In December 2000, Plaintiff was placed under the supervision of Richard Van Allen, a TSE in the Load Evaluation Group in the Bridge Safety and Evaluation Section.  In January 2003, Defendant Zaffetti, who had been promoted from TSE to Manager of the Bridge Safety and Evaluation section, transferred Plaintiff to the Consultant Liaison Group under the supervision of TSE Ralph Phillips.

Plaintiff's employment evaluations reveal that his performance was rated as "excellent" from his hiring in 1994 through 1997.  (Pl.'s Ex. 14)  From 1998 through 2005, however, Plaintiff's performance was rated as only "satisfactory" on the majority of measures.  Id.  In 2006 and 2007, the most recent review provided, Plaintiff once again received predominantly "excellent" ratings.  Id.

Since 2001, Plaintiff has applied for and been denied promotion over twenty times.  (Pl.'s Opp. to Mot. for Summ. Judgment at 2.  See also Pl.'s Ex. 4, Candidate Comparison Chart, listing 23 positions for which Plaintiff has applied since 2001.)  Plaintiff met the minimum qualifications to apply for these positions and in many cases was interviewed for the jobs.  All the individuals selected for the positions for which Plaintiff applied were white, with the exception of one, who was Asian.  (See Pl.'s Ex. 4.)  Thus, in 14 years with the DOT, Plaintiff has not been promoted beyond the TE3 level at which he was placed soon after being hired in 1994.

On September 26 and 27, 2000, Plaintiff testified at a public hearing before the Connecticut Commission on Human Rights and Opportunities ("CHRO") in support of DOT employee Jayantha Mather's employment discrimination complaint against the DOT.  Thereafter,

3

Plaintiff himself filed complaints of discrimination on the basis of race, color, and national origin

against the DOT with the CHRO on June 11, 2001, September 4, 2002, May 3, 2004, and March

17, 2005.[3] (Def.'s Ex. S)  Plaintiff filed the complaint in this suit on November 7, 2005.

## II.    Standard of Review

Summary judgment is appropriate only when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law." FED. R. CIV. P. 56(c).  No genuine issue of material fact exists and summary judgment

is therefore appropriate when "the record taken as a whole could not lead a rational trier of fact to

find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S.

574, 587 (1986).  A material fact is one which "might affect the outcome of the suit under the

governing law," and an issue is genuine when "the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986).  However, "[c]onclusory allegations will not suffice to create a genuine issue." Delaware

& H.R. Co. v. Conrail, 902 F.2d 174, 178 (2d Cir. 1990).  The moving party bears the burden of

establishing that summary judgment is appropriate. Anderson, 477 U.S. at 225.  "A defendant

need not prove a negative when it moves for summary judgment on an issue that the plaintiff

must prove at trial.  It need only point to an absence of proof on the plaintiff's part, and, at that

point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'"

---

[3] Plaintiff also includes some information about another CHRO complaint, which he filed on July 20, 2007, and regarding which he has not exhausted his administrative remedies, in that he has not indicated having obtained a right to sue letter.  Furthermore, Plaintiff admits that Defendant Zaffetti was not named as a respondent in Plaintiff's CHRO complaints, and thus the releases of jurisdiction were not issued against him.  (Def.'s Rule 56(a)(1) Statement ¶ 187)

Parker v. Sony Pictures Entm't, Inc., 260 F.3d 100, 111 (2d Cir. 2001) (quoting Celotex Corp. v.

Catrett, 477 U.S. 317, 324 (1986)).

## III.   Discussion

### A.   Title VII  Statute of Limitations

Plaintiff's Title VII claims alleging failure to promote with regard to certain positions are

barred by the statutory 300-day limitation period.  Pursuant to Title VII, a plaintiff must file a

discrimination complaint with the EEOC within 180 days of the alleged discriminatory act or, if

the complainant has already filed the charge with a state agency, within 300 days of the alleged

illegal act.  42 U.S.C. § 2000e-5(a)(e)(1).  Plaintiff filed his first complaint with the CHRO on

June 11, 2001, 300 days prior to which was August 15, 2000.  Therefore, only discriminatory acts

which occurred on or after August 15, 2000 are actionable.  "Discrete discriminatory acts" such

as failure to promote are not actionable if time-barred, even when related to acts alleged in timely

claims. AMTRAK v. Morgan, 536 U.S. 101, 110-15, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002).

Plaintiff's complaint makes reference to numerous positions for which he applied prior to August

15, 2000.  (Compl. ¶ 23 (a-f))  Because they are time-barred, these denials of promotion do not

give rise to actionable Title VII claims, though evidence of these promotion denials may

constitute relevant background evidence in support of Plaintiff's claim regarding later failures to

promote.  Morgan, 536 U.S. at 113-14.

### B.   Failure to Promote

Plaintiff's discrimination claim alleging failure to promote on the basis of race, color, and

national origin is analyzed under the three-step burden shifting framework established by

McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), Texas Department of Community

Affairs v. Burdine, 450 U.S. 248, 253 (1981), and St. Mary's Honor Center v. Hicks, 509 U.S. 502, 519, 524 (1993). A plaintiff has the initial burden of establishing a *prima facie* case of discrimination by showing that "(i) at the relevant time the plaintiff was a member of the protected class; (ii) the plaintiff was qualified for the job; (iii) the plaintiff suffered an adverse employment action; and (iv) the adverse employment action occurred under circumstances giving rise to an inference of discrimination[.]" Woodman v. WWOR-TV, Inc., 411 F.3d 69, 76 (2d Cir. 2006). A plaintiff's burden in establishing a *prima facie* case of employment discrimination is not an onerous one; he merely has to present facts sufficient to give rise to a presumption of discrimination. See Burdine, 450 U.S. at 254; Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 467 (2d Cir. 2001) ("A plaintiff's burden of establishing a *prima facie* case is *de minimis*.").

A plaintiff's establishment of a *prima facie* case gives rise to a presumption of unlawful discrimination, and the burden of production shifts to the defendant. Id. If the defendant then proffers a "legitimate, nondiscriminatory reason" for the challenged employment action, Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 91 (2d Cir. 2001), "the presumption of discrimination drops out," Roge v. NYP Holdings, Inc., 257 F.3d 164, 168 (2d Cir. 2001), and the plaintiff must prove that the legitimate reasons offered by the defendant were "not its true reasons but were a pretext for discrimination." Id. (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000)). Where Plaintiff raises legitimate questions about whether the proffered reasons are credible or convincing, that goes toward establishing that the reason is pretextual. Meiri v. Dacon, 759 F.2d 989, 997 n. 13 (2d Cir. 1985) (reasonableness of employer's justification for employment action is probative on question of pretext). At all times, the

6

ultimate burden of persuasion remains with the plaintiff to show that the defendant intentionally discriminated against the plaintiff.  Hicks, 509 U.S. at 507 (quoting Burdine, 450 U.S. at 256).

Plaintiff is a black person from the African country of Ghana and is therefore a member of a class protected from discrimination on the basis of race, color, and national origin.  He possessed at least the minimal qualifications for the positions for which he applied, as conceded by Defendants. (Def.'s Memo. in Supp. of Mot. for Summ. Judgment at 4 and 11-12)  Plaintiff suffered adverse employment actions in that he did not receive any of the promotions for which he applied.  The circumstances regarding the failure to promote Plaintiff give rise to an inference of discrimination based on race, color, and/or national origin in that all but one of the people selected for the many positions for which Plaintiff applied and was qualified were white.  Plaintiff has met his *de minimus* burden to establish a *prima facie* case of discrimination.

The burden then shifts to Defendants to state their legitimate, nondiscriminatory reason for the challenged employment actions.  Defendants state that Plaintiff "has not been the successful candidate for any of the positions because he was not the most qualified candidate based on his lack of relevant experience and poor performance during the interview demonstrating either understanding of issues specific to the position or supervisory knowledge compared to the successful candidates."  (Def.'s Memo. in Supp. of Mot. for Summ. Judgment at 4-5.)

Given that Defendants have articulated legitimate non-discriminatory reasons for Plaintiff's non-selection, the burden shifts back to Plaintiff to offer evidence that the Defendants' reasons are merely pretext for discrimination on the basis of race, color and/or national origin.  As evidence of pretext, Plaintiff argues that Defendant's proffered reason is not credible when

the credentials of each selected white candidate are compared with Plaintiff's credentials. Plaintiff offers a side by side comparison of himself with each selected candidate for the jobs for which he applied in his Candidate Comparison chart. (Pl.'s Ex. 4)  However, the document is rather flawed as a tool for this purpose since the relevant comparative information, such as the performance evaluation ratings, educational background, or years of experience of the selected candidates, is in many cases missing, speculative, or arguably inaccurate.[4]

Nonetheless, an examination of Plaintiff's qualifications relative to those of the selected candidates fails to support Plaintiff's contention that his qualifications were so far superior to those of the selected candidates as to suggest that Defendants' justification for hiring them, namely that they were better qualified and performed better in the interview, was pretextual. Notably, most of the positions for which Plaintiff applied were not TSE jobs, the level immediately above his current TE3 level, which would be the typical career progression.  By Plaintiff's count, only eight (8) of the positions that he applied for during the relevant period were TSE jobs.  (Pl.'s Opp. to Mot. for Summ. Judgment at 8.)  Of the persons selected to fill the jobs to which Plaintiff applied, all but one promotion conformed to the typical career progression, with individuals moving up only one experience level at a time (Def.'s Memo. in Supp. of Mot for Summ. Judgment at 17-18), whereas many of the jobs Plaintiff applied for would have required his being promoted two or more levels.  While it is understandable that Plaintiff would have applied for any jobs for which he met the minimum requirements, the simple fact that he applied for a large number of jobs over the years does not create a reasonable

---

[4] Also, the pages of Exhibit 4, which was manually filed, are unnumbered and appear not to be in the correct order.

expectation on his part that, absent discrimination, he would eventually be awarded a position. This is particularly true in light of the fact that the majority of jobs for which Plaintiff applied would have represented a promotion of more than one level from his current position.

Defendants note that in order to have the requisite years of supervisory experience to apply for the jobs at the TPE level and above, Plaintiff had to rely on his years with private consulting firms prior to his tenure at DOT. (Def.'s Memo. in Supp. of Mot. for Summ. Judgment at 4.) While Plaintiff thereby met the minimal qualifications for these upper-level management positions, it can hardly be said that Plaintiff would have been a leading candidate for any of these positions above the TSE level, given that Plaintiff's qualifying experience had occurred elsewhere and had not been directly observed by Defendants. Plaintiff maintains that "Plaintiff's work experience with these private consulting firms . . . was in actuality DOT experience because [the projects for those firms] were all highway bridge projects designed and conducted for Connecticut DOT." (Pl.'s Opp. to Mot. for Summ. Judgment at 32)

Still, it would not have been unreasonable for the DOT to consider experience within DOT as distinct from experience outside the agency, although it also took into account overall experience. An examination of the comparative number of years of experience within the DOT reveals that in eighteen instances, the selected candidate had a longer tenure with DOT than Plaintiff. (Pl.'s Ex. 4) In those 18 instances, the average differential in years of experience working for the DOT between Plaintiff and the selected candidate was substantial, at 9.5 years.[5] In one instance, Plaintiff had the same number of years with the DOT as the selected candidate. In four instances, no information is provided regarding the length of service with the DOT of the

_____

[5] Calculated based upon the information provided in Plaintiff's Exhibit 4.

selected candidate, and in one instance, ambiguous information is provided.[6]  Finally, as

Defendant notes, it is not required to and did not allocate positions solely or primarily on the

basis of seniority (Def.'s Reply at 14-15), as it relied also on other legitimate factors such as

interview performance.

In further support of his allegation that Defendant engages in racially discriminatory

hiring and promotions practices, Plaintiff points to his being hired as an engineer intern, despite

his years of prior experience in the field, only to receive a three level promotion to TE3 nine

months later.  First of all, this occurred in 1994, and is therefore outside the period directly at

issue in this lawsuit.  Even if considered as background context, however, Plaintiff's promotional

path in this respect fails to support his allegation of racial discrimination.  Defendant Zaffetti,

who is white, was also hired as an engineer intern, despite already having significant experience

before being hired, and Zaffetti was also promoted to TE3 a year later, after taking and passing

the applicable exam that was then required.  So too did Plaintiff's passage of the relevant exam

several months after being hired enable his promotion from engineer intern to TE3.

As additional evidence of pretext, Plaintiff points to the elimination of merit

examinations in 1995, and to Defendants' increased reliance thereafter on job interviews, which

he characterizes as impermissibly subjective.  Plaintiff contends that the elimination of merit

examinations as the primary tool for determining promotions was intended to and had the effect

---

[6] In summarizing the DOT experience of Sandra Dumas, Plaintiff's chart states that she has "none," and then indicates in brackets that she has 12 years of experience.  (Pl.'s Ex. 4) Plaintiff includes this same misleading characterization with respect to the "overall professional experience" of Ms. Dumas, apparently because Plaintiff argues that her experience, which he describes as "limited to DOT assignments in Bridge safety inspections and survey issues," is completely irrelevant to the TSE Bridge Design position for which she was selected.  Plaintiff's argument on this point is not compelling.

of disadvantaging him and other persons of color in obtaining promotions.  To the extent that

Plaintiff attempts to allege that these changes in the hiring process constituted systemic

discrimination against racial minorities within DOT, his disparate impact claim fails for lack of

the requisite statistical evidence and expert testimony to support it.  To the extent that he raises

these changes in the hiring process as evidence of pretext in support of his disparate treatment

claim, it fails for a number of reasons.  Plaintiff contends that "Defendant cancelled the merit

exams in October 1995 in order to discriminate against Plaintiff." (Pl.'s Ex. 4.)  He states that in

January 1995 he received a score of over 90% on the relevant exam, which he contends would

have required Defendants to promote him to a TSE position had they not changed the procedure

in October 1995 to rely instead on a more subjective interview process.  (Pl.'s Opp. to Mot. for

Summ. Judgment at 28-29)

　　　As noted previously, this alleged failure to promote is time barred, having occurred far

prior to the period relevant in this suit.  More to the point, however, it is simply not credible that

the entire DOT hiring process was restructured in 1995, only a year after Plaintiff was hired,

solely in order to avoid promoting Plaintiff, who at the time was receiving excellent performance

reviews.  Plaintiff has offered no evidence to support his far-fetched and conclusory allegation

that preventing his promotion was Defendants' motivation for the elimination of the exams, a

change which was broadly implemented as applied to all candidates, not just Plaintiff.  It is

possible that Defendants ceased their sole reliance upon test scores in determining promotions, if

indeed Plaintiff has correctly characterized Defendants' past practices in this respect, in order not

to be forced to appoint people who scored highly on the test regardless of their practical skills in

other areas, such as communication, management, supervision, and cooperation.  A somewhat

more subjective process, such as that involving an evaluation of the candidate at an interview, permits for consideration of other factors in addition to qualifications on paper.

On or about June 2004, Defendants reinstituted the exams, but solely to determine a candidates minimum eligibility for the position through attainment of a passing grade, and Defendants do not rank or appoint candidates for positions based solely upon their relative test scores.  The reinstatement of the exams for this limited purpose enabled Plaintiff to go back and take more recently the exams that would now be required as perquisites for the positions that he applied for unsuccessfully in the past.  To support his contention that he was passed over for promotions despite being better qualified than the selected candidates, Plaintiff points to his strong test scores on nine examinations that he has taken since June 2004 for various transportation positions.  (Pl.'s Ex. 12.)  Plaintiff's scores on the exams, which were administered by the State of Connecticut's Department of Administrative Services, ranged from 82 to 100.[7]  Id.

The problem in using these scores as a means of comparing Plaintiff's qualifications with those of the selected candidates is that Plaintiff has not and can not supply test scores for the selected candidates, in most cases because they did not take the exams, since Defendants' hiring policy in place from 1995 to 2004, which includes the period at issue in this case, did not require the exams.  Plaintiff asks the Court to accept that he "would still have received the same marks then and now" (Pl.'s Ex 4) but there is no way to determine whether Plaintiff's additional years of work experience in the intervening years between his unsuccessful applications and his taking the exams for each position have resulted in higher scores than he would have received at that

_____

[7] All scores were out of 100 points.

12

time.  More importantly, the court has no way to determine and cannot speculate as to what scores each of the selected candidates would have received, had the exam been required and had they consequently taken it at the time of the applications at issue.  To rely on Plaintiff's admittedly good scores to establish anything besides his basic qualification for the positions for which he applied would be to counter-factually assume the relevance of the exams to a hiring process in which they were indisputably not a factor.

Plaintiff takes issue with Defendants' increased reliance on interviews, which he characterizes as unduly subjective, rather than on exam results in making decisions regarding promotions.  While Plaintiff is correct that "'an employer may not use wholly subjective and unarticulated standards to judge employee performance for purposes of promotion,' he offers no evidence that the defendant employed such standards." Skiff v. Colchester Bd. of Educ., 514 F. Supp. 2d 284, 299 (D. Conn. 2007), quoting Knight v. Nassau County Civil Service Comm'n, 649 F.2d 157, 161 (2d Cir. 1981).  Here, the interviews were not wholly subjective, in that they involved panels of interviewers asking each candidate the same pre-written questions which were intended to measure skills and knowledge relevant to the particular job.

Plaintiff also argues that Defendants used "temporary service in a higher class" and "provisional status pending exams" as methods to circumvent the hiring process, and that this was Defendants' means of favoring white candidates over Plaintiff and is evidence of pretext. "'[D]epartures from procedural regularity... can raise a question as to the good faith of the process where the departure may reasonably affect the decision.'" Stern v. Trustees of Columbia Univ., 131 F.3d 305, 313 (2d Cir. 1997), quoting Zahorik v. Cornell University, 729 F.2d 85, 93 (2d Cir. 1984).  However, as Defendants note, in only three instances did Defendants use

13

appointment to temporary service in a higher class to fill positions temporarily prior to conducting interviews for the position, on account of Defendants' immediate business needs. Two were TPE positions and one was a TDE position; none were TSE positions, which was the level above Plaintiff's current level of TE3, making it unlikely that Plaintiff would otherwise have been selected for these positions.  (See Defendants' Reply Memo. at 7)

Aside from his comparisons between himself and the selected candidates, Plaintiff relies primarily on his own unsigned and unnotarized affidavit[8] to support his claim of racial discrimination.  Essentially he asks the fact-finder to attribute his non-selection for the jobs to his race, color, and national origin without offering evidence supporting that attribution.[9]  "Plaintiff's unsubstantiated conjecture and broad allegations of discriminatory practice are insufficient to undermine defendants' proffered reasons for their acts." Santos v. Brooks Pharm., 2008 U.S. Dist. LEXIS 3909 (D. Conn. Jan. 17, 2008).

Notably, Plaintiff has not alleged any racially loaded comments or incidents, or other direct evidence demonstrating racial animus against him.  While such evidence is certainly not required, in its absence, the differential between Plaintiff's qualifications and those of the selected candidates must bear much more of the weight of supporting Plaintiff's contention that Defendants' articulated justification for not promoting him is pretextual.

---

[8] Notwithstanding this significant omission, which is particularly notable in light of the fact that Plaintiff is represented by counsel, the court has fully considered the contentions therein.

[9] For example, Plaintiff states that he was disadvantaged in his job applications on account of his accent.  He bases this allegation on Defendants' interview notes stating that Plaintiff needs to "articulate his qualifications more."  This comment has nothing to do with his accent and is also found in the interview notes of some white candidates without foreign accents who were also not selected.

"When a plaintiff seeks to prevent summary judgment on the strength of a discrepancy in qualifications ignored by an employer, that discrepancy must bear the entire burden of allowing a reasonable trier of fact to not only conclude the employer's explanation was pretextual, but that the pretext served to mask unlawful discrimination. In effect, the plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that 'no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.'"

Mody v. GE, 2006 U.S. Dist. LEXIS 8611 at* 24  (D. Conn. Feb. 21, 2006), (quoting Byrnie, 243 F.3d at 103.)

Plaintiff's own characterization of himself notwithstanding, Plaintiff appears from the record to have been an average or above-average employee, but not the outstanding employee whose qualifications were so clearly superior to those of the selected candidates that no reasonable person could have chosen the selected candidate over the Plaintiff for the job in question.  Defendants relied on applicants' qualifications to determine eligibility for interviews, and then considered those qualifications in conjunction with applicants' performance in the interviews in order to make the final selection.  This process was permissible.  Defendants are entitled to pick between comparably qualified employees, may rely on any non-discriminatory basis in doing so, and may consider somewhat subjective factors such as interview performance as well as the candidates' qualifications on paper in making their hiring and promotions decisions.  Plaintiff has not presented evidence that would permit a reasonable trier of fact to conclude that Defendants' proffered reasons for selecting candidates other than Plaintiff were a pretext for discrimination on the basis of race, color or national origin.  Summary judgment is granted as to Plaintiff's failure to promote claims.

**C.    Retaliation**

Title VII prohibits an employer from "discriminat[ing] against any of [its] employees . . .

because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show: "(1) that he was engaged in protected activity by opposing a practice made unlawful by Title VII; (2) that the employer was aware of that activity; (3) that he suffered adverse employment action; and (4) that there was a causal connection between the protected activity and the adverse action."  Holtz v. Rockefeller & Co., 258 F.3d 62, 79 (2d Cir. 2001) (quoting Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 292 (2d Cir. 1998)).

        Defendants do not dispute that Plaintiff was engaged in protected activity "in testifying at the public hearing before the CHRO regarding the Mather complaint on September 26 and 27, 2000 and in filing his four (4) complaints with the CHRO. . . or that the Defendant DOT was aware of that activity."  (Def.'s Memo. in Supp. of Mot for Summ. Judgment at 31)  Defendants argue, however, that Plaintiff did not suffer any adverse employment action and that there was no causal connection between his protected activity and any alleged adverse treatment.  Id. at 32.

        To establish an adverse employment action for purposes of a Title VII retaliation claim, Plaintiff must present evidence of a "materially adverse change in the terms and conditions of his employment."  Schiano v. Quality Payroll Systems, Inc., 445 F.3d 597, 609 (2d Cir. 2006) (internal citations omitted).  To constitute a "materially adverse" change in the terms of employment, "the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination."  Burlington N. & Santa Fe Ry. Co. v. White, 126 S.Ct. 2405, 2409 (2006).  Examples of such adverse changes

include termination of employment, a demotion evidenced by a decrease in wage or salary, a less

distinguished title, a material loss of benefits, or significantly diminished responsibilities.

Fairbrother v. Morrison, 412 F.3d 39, 56 (2d Cir. 2005).  "Adverse employment actions include

discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand."

Phillips v. Bowen, 278 F.3d 103, 109 (2d Cir. 2002) (quoting Morris v. Lindau, 196 F.3d 102,

110 (2d Cir. 1999) (citing Kaluczky v. City of White Plains, 57 F.3d 202, 208 (2d Cir. 1995);

Rutan v. Republican Party, 497 U.S. 62, 75, 111 L. Ed. 2d 52, 110 S. Ct. 2729 (1990))).

      Defendants assert with respect to Plaintiff's retaliation claim that Plaintiff suffered no

adverse employment action. (Def.'s Memo. in Supp. of Mot. for Summ. Judgment at 36)  To the

contrary, Plaintiff applied, met the basic qualifications, and was not selected for various jobs.  If

his non-selection was motivated by retaliation for his CHRO testimony, then the failure to

promote would indeed constitute an adverse employment action.  A "claim of discriminatory

failure to promote falls within the core activities encompassed by the term 'adverse actions.'"

Treglia v. Town of Manlius, 313 F.3d 713, 720 (2d Cir. 2002).  Whether Plaintiff has

successfully established such causation goes to the fourth prong of the test, not the instant

question of whether Plaintiff has successfully identified an adverse employment action for

purposes of making his *prima facie* case of retaliation.  Failure to promote can constitute an

adverse employment action.  Mody v. GE, 2006 U.S. Dist. LEXIS 8611 at * 20 (D. Conn. Feb.

21, 2006) (listing failure to promote and termination as adverse employment actions); Mandell v.

County of Suffolk, 316 F.3d 368, 383 (2d Cir. 2003) (adverse employment actions include

refusals to promote); Mormol v. Costco Wholesale Corp., 364 F.3d 54, 57 (2d Cir. 2004) (failure

to promote may be sufficient to constitute a materially adverse change in employment); Croom v.

W. Conn. State Univ., 2003 U.S. Dist. LEXIS 25326 at *2-3 (D. Conn. Feb. 7, 2003) (noting that

Plaintiff could have argued an adverse employment action on a failure to promote theory, citing

Stern v. Trs. of Columbia Univ., 131 F.3d 305, 311-12 (2d Cir. 1997)).

To the extent that Plaintiff also attempted to assert as retaliatory the various incidents

cited in support of his hostile environment claim, which is discussed in more detail below,

Defendants are correct that those allegations fail to rise to the level of adverse employment

actions.  For an employment action to be sufficiently adverse, "there must be a link between the

discrimination and some tangible job benefits such as compensation, terms, conditions or

privileges of employment."  Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002).  An adverse

employment action is one that is "more disruptive than a mere inconvenience or an alteration of

job responsibilities."  Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000)

(internal citations omitted).  Thus, Plaintiff's complaints about training opportunities, project

assignments, supervision, performance reviews, personality conflicts, and so forth do not

constitute adverse employment actions.  Reprimands, threats of reprimands, and excessive

scrutiny of an employee, for example, do not constitute materially adverse employment actions.

Lucenti v. Potter, 432 F. Supp. 2d 347, 364 (S.D.N.Y. 2006).  See, e.g., Thompkins v. Potter, No.

3:04-cv-2021, 2006 WL 2563435, at *6 (D. Conn. Sept. 1, 2006); Stembridge v. City of New

York, 88 F. Supp. 2d 276, 283 (S.D.N.Y. 2000).

As the final step in establishing a *prima facie* case of retaliation, Plaintiff must show a

causal connection between the protected activity and the adverse employment action, namely the

failure to promote.  Causation can be demonstrated "indirectly by showing that the protected

activity was followed closely by discriminatory treatment," "through other evidence such as

18

disparate treatment of fellow employees who engaged in similar conduct," or "directly through evidence of retaliatory animus directed against a plaintiff by the defendant."  De Cintio v. Westchester County Medical Center, 821 F.2d 111, 115 (2d Cir. 1987) (internal citations omitted).

Plaintiff offers no direct evidence, such as negative comments by supervisors about his CHRO testimony, that his non-promotion was attributable to retaliatory animus.  In attempting to claim that he has direct evidence of retaliation, Plaintiff asserts without citation that "he was immediately set upon by his supervisors within two weeks of testifying at the Mather hearing and the acts of harassment continued unabated even to the present day."  (Pl.'s Opp. to Mot. for Summ. Judgment at 41)  More specifically, Plaintiff claims that "Within two weeks of his testimony [in the Mather matter], Plaintiff was spoken to by his supervisor Abramowicz[10] regarding reading at his desk, claiming that he appeared to be reading the Bible; Abramowicz also used a union representative to sign Plaintiff's service rating (with which he disagreed) claiming that Plaintiff had refused to sign it."  (Pl.'s Rule 56(a)(2) Statement ¶ 184)  Plaintiff also argues that other DOT employees made unfounded charges against him to his supervisors at DOT, which he attributes to racial animus and/or retaliation for his complaints of racial discrimination.  Co-workers reported that Plaintiff was sleeping at work, was balancing his checkbook at his desk, had left a rude note for an employee he supervised, and so forth.  Plaintiff was never disciplined as a result of any of the incidents alleged against him.  With respect to the note, Plaintiff was informed by his union representative that he would be disciplined if he failed to attend a "dialogue meeting." Plaintiff did attend the meeting and the outcome was that both

---

[10]   Plaintiff has not named supervisor Abramowicz as a defendant in this suit.

parties agreed to work to improve their communication.  Given that Plaintiff suffered no material

negative repercussions as the result of such complaints, they do not constitute adverse

employment actions against him.  Nor do they constitute direct evidence of racial hostility or

retaliation, because there is nothing in these relatively minor incidents in which persons said or

did things suggestive of racial discrimination or of a desire to retaliate against Plaintiff for his

testimony or complaints about such.  They appear to be nothing more than intermittent

personality conflicts between Plaintiff and various co-workers and supervisors.

 To demonstrate causation, therefore, Plaintiff must rely on the timing of the failures to

promote in relation to his CHRO testimony in the Mather matter and the filing of his own CHRO

complaints.  It is questionable whether the failures to promote Plaintiff were sufficiently close in

time to the protected activity to demonstrate causation indirectly.  Temporal proximity of the

adverse action to the protected activity is a key indicator of retaliation.  See Mody v. GE, 2006

U.S. Dist. LEXIS 8611 at *31-32 (D. Conn. 2006); Clark City School Dist. v. Breeden, 532 U.S.

268, 273-74 (2001).  Plaintiff argues that in some cases a causal connection has been found up to

five years after the protected activity.  (Pl.'s Opp. to Mot. for Summ Judgment at 40, citing

Mandell v. County of Suffolk, 318 F.3d 368, 383 (2d Cir. 2003)).  However, as Plaintiff's brief

acknowledges, that case involved direct evidence, which is lacking here.  Id.  As discussed

above, Plaintiff's assertion that he was "set upon" appears to be based solely on his own

attribution of relatively minor incidents to racial animus and retaliation.  Plaintiff does not

identify any concrete basis for his reaching this conclusion.  This does not constitute direct

evidence, and therefore the Mandell case upon which Plaintiff relies is inapposite.

 In order to demonstrate causation based upon timing alone, the protected activity and the

adverse employment action must be sufficiently close in time to support an inference that the two

are related.  The Second Circuit "has not established a specific delay between protected activity

and adverse employment action that defeats an inference of causation."  Burkybile v. Bd. of

Educ. of Hastings-On-Hudson Union Free School Dist., 411 F.3d 306, 314 (2d Cir. 2005).  See

also Gorman-Bakos v. Cornell Co-op Extension, 252 F.3d 545, 554-55 (2d Cir.2001) (listing

cases in the context of Title VII retaliation).  For instance, in Hollander v. American Cynamid

Co., the Second Circuit held that a delay of three months between the protected activity and the

allegedly retaliatory act was fatal to Plaintiff's showing of causation, 895 F.2d 80, 85-86 (2d

Cir.1990), while in Grant v. Bethlehem Steel Corp., the court found that an eight-month delay

supported a showing of causation.  622 F.2d 43, 45-46 (2d Cir.1980).  The operative issue is not

simply the length of time between the protected activity and the alleged retaliation but the

demonstrated nexus between the two.  "Although courts may infer a causal connection when an

adverse action takes place shortly after the protected activity, Manoharan v. Columbia Univ.

Coll. of Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir. 1988), we have affirmed summary

judgment against the plaintiff when there was no evidence of causation other than timing."  Roa

v. Mineta, 51 Fed. Appx. 896, 900 (2d Cir. 2002), citing Hollander v. Am. Cyanamid Co., 895

F.2d 80, 85-6 (2d Cir. 1990), cert. denied, 528 U.S. 965, 145 L. Ed. 2d 311, 120 S. Ct. 399

(1999).

 The following chart shows the date of Plaintiff's protected activity as well as the first date

thereafter when Defendants advertised a position for which Plaintiff applied and was not selected

for the promotion:

| Protected Activity Date: | Job Advertised Date[11]: | Time lapse: |
|---|---|---|
| September 26 and 27, 2000: | February 5, 2001 | 5 months |
| June 11, 2001 | March 11, 2002 | 9 months |
| September 4, 2002 | April 30, 2003 | 8 months |
| May 3, 2004 | July 6, 2004 | 2 months |
| March 17, 2005 | April 2, 2007 | 2 years |

Five months passed between Plaintiff's CHRO testimony on behalf of another employee and his first failure thereafter to be promoted to a job for which he applied. Nine months passed between Plaintiff's first CHRO complaint on his own behalf and his first failure thereafter to be promoted to a job for which he applied. Thereafter, Plaintiff applied for promotions and filed CHRO complaints regarding his unsuccessful applications on an essentially rolling basis, with gaps, to the extent that they are relevant, of eight months, two months, and two years, respectively, between his second through fourth CHRO filings and his next failure to obtain promotion. The only failure to promote that is arguably sufficiently close in time to the protected activity to demonstrate a causal relationship in the absence of other evidence is the two month gap between Plaintiff's third CHRO filing and his next failure to be promoted. At this point, however, Defendants had clearly been on notice for several years of Plaintiff's complaints of discrimination, making the filing of the later CHRO complaints rather questionable as triggers for subsequent retaliation. It is also worth noting that Plaintiff had applied unsuccessfully for numerous promotions prior to engaging in the first protected activity in 2000. Plaintiff's subsequent failures to be selected for other promotions which he sought therefore suggests a continuation of the previous pattern rather than a change in Defendants' treatment of Plaintiff following soon after Plaintiff's first complaints, which might have been suggestive of retaliation.

---

[11] The Court has utilized the dates provided in Plaintiff's Exhibit 4.

On balance, given the gaps of several months between Plaintiff's CHRO testimony and complaints and his subsequent failures to be promoted, as well as the lack of direct evidence suggestive of retaliation, Plaintiff has failed to demonstrate a causal relationship between the protected activities and the adverse employment actions.

Nonetheless, assuming *arguendo* that Plaintiff has met his relatively light burden to demonstrate causation and make a *prima facie* case, the burden shifts to Defendants to identify a legitimate, non-discriminatory reason for the failure to promote. Slattery, 248 F.3d at 94-95. As discussed in detail in the previous section, Defendants maintain that Plaintiff was not selected for any of the positions for which he applied because in each instance, another candidate was better qualified, and because Plaintiff did not perform as well in the interview. This constitutes a legitimate, non-discriminatory reason for the failure to promote Plaintiff. Plaintiff has offered no evidence that Defendant's articulated reason for failing to promote him is in fact a pretext for retaliation.

Viewing any factual ambiguities in Plaintiff's favor, the Court finds that there is insufficient evidence of any causal connection between Plaintiff's complaints regarding racial discrimination and the failures to promote. Furthermore, even if Plaintiff had demonstrated such a causal connection, he has failed to proffer evidence showing that Defendant's legitimate non-discriminatory reason for promoting other candidates rather than him is pretextual. There is no evidence based upon which a reasonable fact finder could attribute the failure to promote Plaintiff to his testimony or complaints regarding racial discrimination. Therefore, Defendant's motion for summary judgment is granted as to Plaintiff's claim of retaliation.

**D.      Hostile Work Environment**

The crux of Plaintiff's argument is that his work environment was hostile on the basis of race, color or national origin in that he was not promoted, while white co-workers were promoted.  See Compl. ¶¶ 65(b); 65(c); 65(f) ("Plaintiff was not promoted"); 65(q) ("Plaintiff's application for promotion was rejected"); 65(t) ("Plaintiff has not been promoted since 1995" ). As discussed above, each failure to promote is a discrete act, and a claim regarding each is barred if not timely filed.

To the extent that Plaintiff's hostile work environment claim is not merely duplicative of his Title VII failure to promote claim, Plaintiff describes the following as collectively constituting a hostile work environment: "Plaintiff was refused permission to make presentations at public information meetings regarding work where he was project Engineer, his ability to attend external professional courses and seminars, the re-assignment of major portions of valuable projects to others who then received credit, a diminution in the service ratings on his performance appraisals, and the disparate handling of employee complaints against him." (Pl.'s Opp. to Mot. for Summ. Judgment at 39) (errors in original).  As Defendants note, most of these incidents took place in 1998-1999, which is prior to the period in question in this suit. (See Compl. ¶ 65.)  Even considered collectively, however, the allegations fail to amount to a hostile work environment.  In some cases, Plaintiff's characterization of the incident in question is not supported by any admissible evidence.  Furthermore, Plaintiff provides no evidence, aside from his conclusory supposition, that the alleged incidents were motivated by animus or hostility on the basis of his race, color, or national origin.

For example, Plaintiff claims that other employees who are white and are at his same

level, TE3, were permitted to give public presentations, while he "was never given the opportunity to present anything" (Pl.'s 56(a)(2) Statement, ¶ 48), which he attributes to his race. However, Plaintiff can cite no specific instances and admits that he has no firsthand knowledge of public presentations given by other TE3 level employees, except to say that he "has heard or read reports" of such.  Id. (See also Def.'s 56(a)(1) ¶¶ 41- 42, in which Plaintiff admitted that his knowledge is based on people talking in the office.)

Plaintiff's claim that he was denied training opportunities as compared with white TE3s supervised by Defendant Zaffetti is also factually unsupported.  Plaintiff admits that he attended more in-house training seminars than any other TE3 supervised by Zaffetti. (Def.'s 56(a)(1) ¶ 57) Plaintiff also admits that he was not discriminated against with respect to professional seminars sponsored by outside groups but held in Connecticut.  (Def.'s 56(a)(1) ¶ 58)  He clarifies that his claim relates only to out of state seminars requiring hotel accommodations.  (Pl.'s 56(a)(2) ¶ 58) Again, however, he offers no specifics or support for this assertion.  The remainder of Plaintiff's claims show a similar pattern of lacking factual support.

A successful hostile work environment claim requires conduct that is sufficiently severe or pervasive to create an abusive workplace permeated with discriminatory intimidation, ridicule and insult that unreasonably interferes with an employee's work performance.  Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993); Patterson, 375 F.3d at 227.  There must also be a specific basis for imputing that hostile conduct to the employer.  Id. Hostile work environment claims have both objective and subjective components. Petrosino, 385 F. 3d at 221.  The discriminatory conduct must be so pervasive that a reasonable person viewing the "totality of the circumstances" would recognize an "objectively hostile or abusive work

environment." Id. at 221-22.  Factors relevant in determining whether a workplace is objectively permeated with discrimination include the frequency of the discriminatory conduct, its severity, whether the conduct was physically threatening or humiliating, whether the conduct unreasonably interfered with plaintiff's work, and whether any psychological harm resulted. Patterson, 375 F.3d at 227; Richardson, 180 F.3d at 437; Williams v. County of Westchester, 171 F.3d 98, 100-01 (2d Cir. 1999).

Only those actions which would have been materially adverse to a reasonable employee are Title VII actionable. See Robinson v. Shell Oil Co., 519 U.S. 337, 346, 117 S. Ct. 843, 136 L. Ed. 2d 808 (1997).  "[T]he ordinary tribulations of the workplace, such as sporadic use of abusive language" do not give rise to a claim. Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998).  Title VII does not establish a "general civility code for the American workplace." Burlington Northern and Sante Fe Ry. Co. v. White, 548 U.S. 53, 126 S. Ct. 2405, 2415, 165 L. Ed. 2d 345 (2006); Bickerstaff v. Vassar College, 196 F.3d 435, 452 (2d. Cir 1999). What is required is abusive conduct of such severity and/or pervasiveness as to create a hostile environment which interferes with an employee's work, Alfano v. Costello, 294 F.3d 365, 373 (2d. Cir. 2002), and permeates the workplace with discriminatory intimidation, ridicule and insult of such severity and pervasiveness as reasonably to be viewed as altering the conditions of employment. Demoret v. Zegarelli, 451 F.3d 140 (2d. Cir. 2006); Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 67, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986). Altered conditions must be intolerable. Harris, 510 U.S. at 21. A merely "unpleasant, harsh, combative or difficult work environment" is insufficient. Paddock v. Brockport, 418 F. Supp. 2d 288, 291, 293 (W.D.N.Y 2000).

Viewing the evidence in the light most favorable to Plaintiff as the non-moving party, the court concludes that no reasonable factfinder applying the standards above and viewing the totality of the circumstances would consider Plaintiff to have been subjected to an objectively hostile or abusive work environment on account of his race, color or national origin.  Summary judgment is therefore granted to Defendants on Plaintiff's hostile work environment claim.

### E.    Connecticut General Statutes § 46a-58

Plaintiff also asserts a claim pursuant to Connecticut General Statutes § 46a-58(a), which provides, "It shall be a discriminatory practice in violation of this section for any person to subject, or cause to be subjected, any other person to the deprivation of any rights, privileges or immunities, secured or protected by the Constitution or laws of this state or of the United States, on account of . . . national origin, . . . color [or] race."  However, "In recent years, on several occasions, courts of this state have held that §46a-58 does not give rise to a private cause of action."  Batiste v. Soundview Med. Assocs., LLC, 2008 Conn. Super. LEXIS 709 (Conn. Super. Ct. Mar. 25, 2008), citing Alungbe v. Board of Trustees of Connecticut State University, 283 F. Supp. 2d 674 (2003); Garcia v. St. Mary's Hospital, 46 F. Supp. 2d 140, 141 (D. Conn. 1999). Connecticut General Statutes § 46a-58 is "penal in nature. There is no statutory authorization to bring private actions based on a violation of [this statute], nor does the Release to Sue letter authorize such an action."  Wright v. City of Hartford, 1998 Conn. Super. LEXIS 433, 8-9 (Conn. Super. Ct. Feb. 13, 1998).  See also Lyon v. Jones, 2003 Conn. Super. LEXIS 1960, 2-3 (Conn. Super. Ct. July 2, 2003) (finding no private cause of action, in light of C.G.S. § 46a-58(d) provision that "Any person who violates any provision of this section shall be guilty of a Class A Misdemeanor, except that if property is damaged as a consequence of such violation in an

27

amount in excess of $ 1,000, such person shall be guilty of a Class D Felony.") Therefore,

summary judgment is granted to Defendants as to Plaintiff's claims under C.G.S. § 46a-58.

**F.      Section 1983 Equal Protection Claim**

Plaintiff also claims that "Zaffetti, acting in his official capacity, deprived plaintiff of his

equal protection under the law because of plaintiff's race, color and national origin" and that

"such right[s] are secured under the Fourteenth Amendment of the Constitution of the United

States."  (Compl. ¶ 90.)  Plaintiff has not briefed the equal protection claim which he asserts

pursuant to 42 U.S.C. § 1983 (See Pl.'s Opp. to Mot. for Summ. Judgment), and therefore it is

properly dismissed on grounds of abandonment.  Plaintiff's equal protection claim pursuant to 42

U.S.C. § 1983 would fail for substantially the same reasons that his Title VII claim fails,

specifically that "in failing to prove disparate treatment for a Title VII claim based on the failure

to promote . . . [the plaintiff] has also necessarily failed to meet the purposeful discrimination

requirement for a section 1983 violation based on equal protection or a section 1981 claim."

Gonzalez v. Connecticut, 151 F. Supp. 2d 174, 183 (D. Conn. 2001), quoting Knight v. Nassau

County Civil Serv. Comm'n, 649 F.2d 157, 161-62 (2d Cir. 1981) (citations omitted).

Plaintiff's suit for damages against Zaffetti as an individually named defendant acting in

his official capacity is barred by the Eleventh Amendment.  "The Eleventh Amendment bars a

suit against state officials when 'the state is the real, substantial party in interest.'" Pennhurst

State Sch. & Hosp. v. Halderman, 465 U.S. 89, 101 (1984) (quoting Ford Motor Co. v.

Department of Treasury of Indiana, 323 U.S. 459, 464 (1945)).  To the extent that Plaintiff

intended, notwithstanding the language in the complaint specifying that Zaffetti was sued "in his

official capacity," to sue Zaffetti in his individual capacity, that fails for lack of personal

jurisdiction because Zaffetti was never personally served.  Instead, a copy of the summons and complaint were left with Gregory T. D'Auria at the Office of the Attorney General, who was not authorized to accept service for Zaffetti in his individual capacity.  Such service is inadequate to establish personal jurisdiction over Zaffetti in his individual capacity.  Burgos v. Department of Children and Families, et al., 83 F. Supp. 2d 313, 316 (D. Conn. 2000); Bishop v. State of Connecticut, et al., Case No. 3:01cv1140(AVC)(D. Conn. March 31, 2004); Bogle-Assegai v. Connecticut, 470 F.3d 498 (2d Cir. 2006).

## IV.    CONCLUSION

Defendant's motion for summary judgment [Doc. No. 76] is **granted** as to all counts. The Clerk shall close the case.

SO ORDERED.

Dated at New Haven, Connecticut, January  9 , 2009.

_____/s/_____
Peter C. Dorsey, U.S.D.J.